IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JUSTIN VIRDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 11-0189-DRH-CJP |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to Chief Judge David R. Herndon pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Justin Virden seeks judicial review of the final agency decision finding that he is not disabled and denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Plaintiff applied for DIB and SSI in April, 2007, alleging disability beginning on March 31, 2006. (Tr. 14). He claims disability due to bi-polar disorder with attempted suicide. (Tr. 165).

After the application was denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) Sandra K. Rogers. (Tr. 26-63). ALJ Rogers denied the application for benefits in a decision dated March 13, 2009. (Tr. 14-25). The Appeals Council

---

[1]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

denied review on January 12, 2011, and the ALJ's decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Mr. Virden filed a motion for summary judgment at Doc. 15. In his memorandum in support, he raises the following points:

1. The ALJ erred in finding that he would not be disabled were it not for his substance abuse.

2. The assessment of plaintiff's credibility was not supported by substantial evidence.

3. The hypothetical question posed to the vocational expert did not include all of his limitations.

## Applicable Legal Standards

In order to receive DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) & 1382c(a)(3)(D).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3)

whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner's burden at step five is to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Virden is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richard v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater***, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue***, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Rogers followed the five-step analytical framework described above. She determined that Mr. Virden had not been engaged in substantial gainful activity since the alleged onset date. She found that he has severe impairments of depression and bipolar disorder, along with substance abuse disorder, and that his condition does not meet or equal a listed impairment. Considering his substance abuse disorder, the ALJ found that Mr. Virden's residual functional capacity (RFC) renders him unable to perform any work. However, when she excluded his substance abuse, she found that he had the RFC to perform a full range of work at all exertional levels, with mild impairment of activities of daily living and moderate impairment in maintaining social functioning and in maintaining concentration, persistence and pace. In response to a hypothetical question, a vocational expert (VE) testified that a person with plaintiff's RFC could not do his past work, but could do the jobs of commercial cleaner, laundry worker and dishwasher, which exist in significant numbers in the economy. The ALJ accepted this testimony and found that plaintiff could perform those jobs and was therefore not disabled. (Tr. 14-25).

### The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.      Agency Forms**

Mr. Virden was born in 1972, and was 32 years old when he allegedly became disabled.

(Tr. 139).  He had worked as a packager, a machine and forklift operator and a delivery man. (Tr. 143).  He said that he had gotten fired from jobs because he was unable to go into work due to depression and because of hospitalizations and medical treatment. (Tr. 165).  He completed high school and one year of college.  (Tr. 173).

He is insured for DIB through December 31, 2011.  (Tr. 140).

**2.    Evidentiary Hearing**

Plaintiff was represented at the hearing by an attorney.  (Tr. 28).

Mr. Virden testified that he has had problems with mental illness since 1994.  He was "very manic" early on, and has had depression in recent years.  (Tr. 32-33).  He has abused alcohol and drugs, and he feels his substance abuse was related to his bipolar disorder.  He said that he had been sober since April.  (Tr. 33-34).  (The hearing took place in January, 2009).

The alleged onset date is March 31, 2006.  Mr. Virden testified that he was having his "first real severe depression" at that time.  (Tr. 35).  This depression "crippled" him and he became very reclusive.  He was hospitalized 4 times from March to May, 2006.  He attempted suicide.  (Tr. 37-38).  He tried working in a factory for a few weeks in January, 2007, but was fired.  (Tr. 38-39).  He continued to seek mental health treatment.  He last used drugs or alcohol in February of 2008.  (Tr. 40).

Plaintiff went to a rehab program at Chestnut in April, 2008.  (Tr. 41).

He has been on a number of medications for bipolar disorder, including Prozac, Seroquel and Linectel.  (Tr. 41).  Prozac made him jittery and gave him hot flashes.  The doctor switched him to Remeron, which has a "very sedative effect."  (Tr. 42).   In the November prior to the hearing, he was having anxiety, and Dr. Ernst put him on Clonazepam.  He them became severely depressed and reclusive.  (Tr. 42).

Mr. Virden testified that he has up periods and down periods.  The down periods last weeks and months.  (Tr. 43).  When he has a downturn, he would be unable to get out of bed

every day and go to work. It is difficult for him to concentrate. (Tr. 44). He has problems with memory. When he is depressed, he becomes reclusive and will not even answer the phone. He does not shower or clean his apartment. (Tr. 46).

He lives on his parents' farm, in a shed which his father has converted to an apartment. (Tr. 44).

Plaintiff's mother testified that he cannot function when he is ill. Since 2006, he sleeps a lot and has memory problems. He has trouble interacting with his children. (T. 52-53). She testified that his last relapse was before he went to rehab in April. (Tr. 53). Ms. Virden testified that her son "cycles" in that he gets depressed in the Fall, and it lasts sometimes into the Spring. He had been severely depressed for the past few months leading up to the hearing. (Tr. 54).

Plaintiff was again hospitalized in December of 2007. He became very depressed and had suicidal thoughts. (Tr. 57). He first testified that he was not using drugs or alcohol then. (Tr. 58). He later changed his testimony to say that he did have a relapse and used alcohol and marihuana a couple of weeks prior to that hospitalization. (Tr. 62).

Mr. Schmidt testified as a vocational expert (VE). (Tr. 58). The ALJ asked him to assume "as set forth in Exhibit 8F" a person with moderate limitation in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods of time, ability to work in the vicinity of others without being distracted, ability to interact with the general public, ability to get along with co-workers without distracting them or exhibiting behavioral extremes.[2] The VE testified that this person would not be able to do any of plaintiff's past work. He further testified that "attention, concentration, ability to get along with others, to interact appropriately and to avoid behavioral extremes are essential to any employment setting...." (Tr. 59). The VE later clarified that there would be no other jobs that this person

---

[2]Exhibit 8F is the state agency consultant's mental RFC assessment. Tr. 394-397.

could do. (Tr. 61).

The ALJ then asked a second hypothetical, "as set forth in Exhibit 7, page 11," in which she asked the VE to assume mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties maintaining concentration.[3] (Tr. 59-60). The VE testified that such a person could not do plaintiff's past work, but could do other jobs such as commercial cleaner, laundry worker and dishwasher, which exist in substantial numbers. (Tr. 60).

Upon questioning by plaintiff's counsel, the VE testified that a person who missed 2 or more days of work a month or whose persistence or pace were affected by marked fatigue would be unable to do the jobs identified by him. (Tr. 61).

**3.    Medical Records**

Mr. Virden was admitted to St.. Mary's Good Samaritan Hospital in Centralia, Illinois, on February 18, 2006, with an Axis I diagnosis of bipolar disorder, mixed episode. He had been stressed and "feeling like he was going to get manic." He loaded a gun on the day prior to admission, but "could not do it." His father brought him to the emergency room and he was admitted. He was discharged on February 21, 2006, after being treated with therapy and medication. He was started on Abilify and Seroquel. He was referred to Dr. Chalfant. (Tr. 337-338).

Mr. Virden was readmitted to St. Mary's on April 22, 2006, after a suicide attempt. He was voluntarily admitted to a locked psychiatric unit. (Tr. 289). On the day after admission, a staff member found what appeared to be marihuana in his shirt pocket. (Tr. 299). During the hospitalization, his mother told a nurse that, the prior week, plaintiff was using alcohol and

---

[3]Exhibit 7F is the state agency consultant's Psychiatric Review Technique Form. (Tr. 380-393). The word "concentration" is noted as inaudible in the transcript, but the parties agree that, based on the content of Exhibit 7F, the ALJ said "concentration."

abusing his anti-anxiety medication, Ativan. Plaintiff denied abusing his medication, but did admit to using alcohol and cocaine on the day that he contemplated suicide. He also said that when he is doing well he does not use alcohol or drugs, and that he had been "clean for several months." (Tr. 298). The discharge summary indicates that his immediate crisis had been precipitated by a break-up with a girlfriend. He was treated with therapy and medication, and was discharged on April 27, 2006, in stable condition. The Axis I diagnoses were bipolar type 1 disorder with alcohol and polysubstance dependence. (Tr. 289-290).

Plaintiff was seen at Angela Center for bipolar disorder and panic disorder in March and April, 2006. (Tr. 266-269).

Mr. Virden was again admitted to St. Mary's on May 9, 2006. He had stopped taking his medications and was using cocaine, and had become suicidal. (Tr. 271). He was noted to be "extremely depressed, hopeless [and] overwhelmed." (Tr. 273). He was restarted on his medications and was "admonished" that he would be referred to a longer term facility if he presented to the hospital again. He was discharged on May 12, 2006. (Tr. 271).

In July, 2006, plaintiff began seeing Dr. Michael Ernst at Wellness Link. In the initial assessment, he gave a history of manic episodes lasting a week or longer, and depressive episodes lasting two weeks or longer. He reported that he tended to binge drink when he was manic, and he had one DUI. He also had a history of cocaine and cannabis use, but said he had been sober since June 1, 2006, and had undergone chemical dependency counseling at Helm DUI Services. He had pending charges of DUI and obstruction of justice. Dr. Ernst diagnosed bipolar disorder and polysubstance abuse. He recommended reducing Abilify, which was causing side effects, prescribed Klonopin and Ambien, and told plaintiff it would be "imperative" for him to remain sober in order to get control of his bipolar disorder. (Tr. 358-359). On August 1, 2006, plaintiff denied alcohol and drug use, and stated that he had arranged to attend a rehab program in Bloomington, Illinois. (Tr. 356).

On August 2, 2006, plaintiff was admitted to a residential rehab program at Chestnut Health Systems in Bloomington, Illinois, on a referral from Fayette County Probation. (Tr. 361). On initial assessment, it was noted that he had been charged with illegal possession and consumption of alcohol by a minor several times, and had three DUI charges. He had also been charged with possession of crack paraphernalia and obstruction of justice due to lying about his identity. His previous probation was revoked and he spent 30 days in county jail. He was in mandatory DUI classes from April through July, 2006, but continued to use alcohol and drugs, which led to his referral to a residential program. He indicated that he had been terminated from his job at Graham Packaging in April, 2006, due to a shortage of work. His drug of choice was cocaine. He reported that he began drinking alcohol and smoking cannabis at the age of 15. He last used cocaine, alcohol and cannabis in July, 2006. He also abused Xanax. He said that he overdosed on Xanax and was hospitalized on July 14, 2006. (There are no records for that hospitalization in the record.) He also admitted to occasional use of LSD, ecstacy, methamphetamine, and mushrooms. (Tr. 361-368). He was discharged from the program on August 29, 2006, having successfully achieved most of his goals. He continued to take Abilify during the program. Random drug testing was clean. He attended Alcoholics Anonymous/Narcotics Anonymous/Cocaine Anonymous meetings, and obtained a sponsor. On discharge, he was encouraged to continue to attend self-help group meetings and to remain in contact with his sponsor. (Tr. 369-373).

On March 14, 2007, plaintiff was seen at the Community Resource Center. He was experiencing an increase in depression. He was not taking his medication because he could not afford it. He had no job and no insurance. He denied having used any alcohol or other substances since July, 2006. He was oriented in all spheres, with some suicidal ideation but no plan. His thought processes were intact. A referral for outpatient psychiatrist services was made. (Tr. 450-451). He was seen again at Community Resource Center for counseling on

March 29, 2007. He was crying and felt like he wanted to give up. He was noted to have bipolar disorder. It was noted that he had been sober for about 6 months. (Tr. 448). He was seen again on the next day. He was "very depressed" and wanted to start medication again. He went back and forth as to whether he could "continue or not." He was again noted to be sober. (Tr. 446-447).

On June 6, 2007, Plaintiff was assessed at Community Resource Center. His presenting problem was that he was depressed with suicidal ideation but no plan. (Tr. 430). He was not taking any medications. He had stopped Lithium, Depakote and Zyprexa because he did not want to take them. He said that Abilify worked but his insurance had run out. (Tr. 434). He denied current use of illegal drugs or alcohol. (Tr. 437). The clinical summary stated that he was "miserable experiencing wide ranges of emotions, from depression to mania with anxiety." He was said to need psychotropic medications. (Tr. 443). The recommendation was that he participate in psychiatric services, individual therapy and substance abuse counseling due to his extensive history. (Tr. 444).

Stephen Vincent, PhD, performed a consultative psychological examination on July 3, 2007. (Tr. 376-379). Plaintiff reported that he was not taking any medications, but had an appointment to see a psychiatrist on July 31, 2007. He said his drug and alcohol problems had been in remission since his treatment at the Chestnut Center. He felt that he was in a hypomanic phase of his bipolar disorder. On examination, his speech was overproductive and overinclusive due to push of speech. He had hypomanic-like signs and symptoms. His thought processes were disrupted by racing thoughts. The Axis I diagnosis was bipolar disorder, currently in manic phase, with history of polysubstance use and dependence, currently in remission.

On July 23, 2007, state agency consultant Phyllis Brister, PhD, completed a Psychiatric Review Technique form. (Tr. 380-393). She concluded that Mr. Virden has bipolar disorder, personality disorder, and substance addiction disorder. With regard to the "B" criteria, she

found that Mr. Virden has mild limitation in activities of daily living, and moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace. She also found that he had one or two episodes of decompensation. (Tr. 390). The "C" criteria were not present. (Tr. 391). She concluded that plaintiff's condition therefore does not meet or equal a listed impairment. Among the materials that she reviewed were Dr. Vincent's report, which she noted indicated that his polysubstance dependence was in remission. She also had records from some hospitalizations, but did not indicate that she reviewed the records of the inpatient rehab program from August, 2006. (Tr. 392).

Dr. Brister also completed a Mental Residual Functional Capacity Assessment form on July 23, 2007. (Tr. 394-397). She opined that plaintiff was not significantly limited in many areas of mental activities, but did note moderate limitation in the ability to to carry out detailed instructions, maintain attention and concentration, work in coordination with or proximity to others without being distracted, interact appropriately with the general public, and get along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 395). Dr. Brister noted that his polysubstance abuse was in "early remission" and that he had no further hospitalizations for a period of one year following cessation of drug use. (Tr. 396).

He was seen by Dr. Keeven at Community Resource Center on July 31, 2007. (Tr. 405). His extensive history was reviewed. He reported that he had been sober for the last year. He was noted to be unable to work due to depression. He was started on Lamictal. (Tr. 408). On September 11, 2007, it was noted hat his bipolar symptoms were stable on Lamictal, although he had been out of medication for 5 days. He denied any substance abuse and was working the night shift in a warehouse in Effingham. (Tr. 403).

Plaintiff had a relapse in December, 2007. He was admitted to St. Mary's Good Samaritan Hospital on December 19, 2007, with depression and suicidal thoughts. The Intake Evaluation states that he had been drinking in a bar the day prior to admission, and someone

-11-

gave him some Xanax. He then went to what he thought was the apartment of a friend. This turned out to be a stranger's apartment. He became "belligerent" and the police were called. He was arrested because he possessed Xanax without a prescription. The doctor noted his extensive psychiatric history and prior hospitalizations. She also noted that he had missed counseling appointments and had been noncompliant with his medications. "He said that he gets put on medications, does not see the point, uses drugs, and then gets off his medications." He had a period of "intermittent sobriety" for a year and a half. He relapsed because he knew he would not be seeing his probation officer for two months, so he started smoking marihuana and taking benzodiazepines, i.e, Xanax. (Tr. 551-553). Mr. Virden was admitted to a locked psychiatric ward and was placed on suicide precautions and a detox protocol. (Tr. 553). He was treated with medication and counseling. (Tr. 543-547). He was discharged on December 24, 2007. (Tr. 531).

Plaintiff returned to Dr. Ernst on December 31, 2007. He had not seen that doctor since August, 2006. Dr. Ernst noted that he had been off his medication and had a recurrence of bipolar disorder-depressed episode. He had been sober since December 19, 2007. He was working at Graham Packaging. Lamictal and Remeron had been started while he was in the hospital. Dr. Ernst adjusted the dosage and added Vistaril. (Tr. 479-480).

Dr. Ernst's notes indicate that Mr. Virden was sober until late February, 2008, when he again relapsed. He had been increasingly depressed before relapsing. Dr. Ernst recommended that he try the rehab program at Chestnut again. (Tr. 475). He was on a waiting list for the program and struggled with sobriety and depression during that time. (Tr. 472-476).

Mr. Virden was admitted to the residential rehab program at Chestnut on March 24, 2008. He was successfully discharged on April 18, 2008, having reached a majority of his goals. He continued to take medication for his bipolar disorder, and did not have significant symptoms during the program. He indicated that he wanted to return to work after his discharge. He was

referred to the Community Resource Center for continuing care. (Tr. 520-525).

Plaintiff saw Dr. Ernst on April 28, 2008. He was sober and was attending AA meetings twice a week. His mood was stable. He was taking Prozac, Seroquel and Lamictal. Dr. Ernst felt he could return to work in a week. (Tr. 471). On May 27, 2008, Dr. Ernst's note says that plaintiff was laid off from work. (Tr. 470). In June, 2008, he was still sober and was noted to be worried about his job because business was very slow. (Tr. 469). In August, 2008, Dr. Ernst wrote that he had been laid off work. He was still sober and going to AA. (Tr. 468).

Dr. Ernst's records from November, 2008, through January, 2009, indicate that plaintiff remained sober, but he was depressed and had panic attacks. (Tr. 526-529).

**<u>Analysis</u>**

42 U.S.C. §423(d)(2)(C) was amended, effective as of March 29, 1996, to provide that, "[A]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

20 C.F.R. §404.1535 sets forth the procedure for determining whether alcoholism or drug addiction is a contributing factor to disability. In a nutshell, the key factor is whether the claimant would be found to be disabled if he or she stopped using alcohol or drugs. This inquiry requires the ALJ to determine the claimant's RFC under two scenarios. First, the ALJ determines RFC assuming continued substance abuse. If the claimant would be disabled under that RFC assessment, the ALJ must then determine the claimant's RFC without substance abuse. If the claimant would not be disabled in the absence of substance abuse, disability must be denied. 20 C.F.R. §404.1535(b)(2).

Plaintiff argues, correctly, that the ALJ erred in her RFC determinations. ALJ Rogers based both of the RFC determinations on the findings of the state agency consultant, Dr. Brister. The ALJ said that she gave significant weight to the state agency consultant's opinions as set

forth in the Mental RFC Assessment and the Psychiatric Review Technique. (Tr. 20).

For her findings as to plaintiff's RFC including substance abuse, the ALJ adopted the state agency consultant's RFC findings as set forth in the Mental RFC Assessment. (Tr. 19). The first hypothetical question posed to the VE was explicitly based on those findings. The VE testified that a person with that RFC would be unable to perform any work because "attention, concentration, ability to get along with others, to interact appropriately and to avoid behavioral extremes are essential to any employment setting...." (Tr. 59).

The ALJ failed to recognize that the state agency consultant, Dr. Brister, did the RFC assessment on July 23, 2007, almost a year after the first residential rehab program. Dr. Brister noted that his polysubstance abuse was in "early remission" and that he had no further hospitalizations for a period of one year following cessation of drug use. (Tr. 396). The ALJ gave no reason for concluding that Dr. Brister's RFC findings contemplated his functional capacity assuming continued substance abuse. Dr. Brister's comments on the form clearly indicate that she considered that his substance abuse was in remission. Therefore, the ALJ's finding that the mental RFC assessment included substance abuse is without any support in the record.

The ALJ's findings as to plaintiff's RFC excluding substance abuse were also erroneous. These findings, set forth at Tr. 22, were taken directly from Dr. Brister's assessment of the B criteria in the Psychiatric Review Technique form. In asking the second hypothetical question, the ALJ said the assumptions were "as set forth in Exhibit 7, page 11." (Tr. 59-60). Exhibit 7 in the administrative proceedings was the Psychiatric Review Technique form.

The so-called B criteria are the criteria of section B of most of the mental health listings. 20 C.F.R. Subpart P, App. 1, 12.00. The B criteria are relevant to determining whether the claimant meets or equals a listed impairment. However, the B criteria are not an assessment of RFC. The ALJ acknowledged this fact. Citing to SSR 96-8p, she said that an RFC assessment

"requires a more detailed assessment by itemizing various functions contained in the broad categories" of the B criteria. See, Tr. 22. Nonetheless, she proceeded to simply adopt the B criteria assessment for her findings as to plaintiff's RFC without substance abuse.

The Commissioner does not seriously dispute that ALJ Rogers' RFC findings were erroneous. In fact, he admits that she "did not clearly set forth the factors relevant for a determination that substance abuse was not material to Plaintiff's disability...." Doc. 27, p. 9. The determination of whether substance abuse contributes to Mr. Virden's disability is the central issue in this case. The ALJ's error requires reversal.

Plaintiff argues that the Court should reverse and order an award of benefits. The Court can order an award of benefits only where "all factual issues have been resolved and the only outcome possible is a determination of disability." **Rucker v. Astrue, 414 Fed. Appx. 844, 845 (7th Cir. 2011)**, citing **Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005).** That is not the case here.

The ALJ misconstrued Dr. Brister's assessment of plaintiff's mental RFC in that the ALJ believed that the assessment was based on the assumption that plaintiff was still abusing alcohol and/or drugs. An ALJ is not required to accept the opinion of a state agency consultant, especially as to RFC, which is an issue reserved to the Commissioner. 20 C.F.R. §404.1527(e) & (f). There is no way of knowing whether the ALJ would have adopted Dr. Brister's RFC assessment had she understood it correctly. Further, the ALJ's RFC assessment at the second stage was clearly lacking in that she simply adopted the B criteria findings, in violation of SSR 96-8p. The case should be remanded so that the ALJ can perform a proper assessment of RFC with and without substance abuse.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new

evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. **See,** ***Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan***, 195 F.3d 975, 978 (7th Cir. 1999).

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that plaintiff's Motion for Summary Judgment **(Doc. 15)** be **GRANTED**, and the that Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g)..**

Objections to this Report and Recommendation must be filed on or before **November 21, 2011.**

**Submitted: November 4, 2011.**


s/ Clifford J. Proud  
CLIFFORD J. PROUD  
UNITED STATES MAGISTRATE JUDGE